LEXSEE 1992 U.S. DIST. LEXIS 21285

PENNY KLEI, Plaintiff, v. METROPOLITAN LIFE INSURANCE COMPANY, Defendant.

No. 91-CV-76942-DT

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

1992 U.S. Dist. LEXIS 21285

October 30, 1992, Decided
October 30, 1992, Filed

**LexisNexis (TM) HEADNOTES- Core Concepts:**

**JUDGES:** [*1] Rosen

**OPINIONBY:** GERALD E. ROSEN

**OPINION:**

OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S COUNTER-MOTION FOR SUMMARY JUDGMENT AND DISMISSING PLAINTIFF'S CASE IN ITS ENTIRETY WITH PREJUDICE

**I. INTRODUCTION**

This ERISA denial-of-benefits action is presently before the Court on the parties' cross-motions for summary judgment. The Court has reviewed and considered the parties' briefs in support of their respective positions, and having heard the oral arguments of Plaintiff's and Defendant's attorneys at the hearing held on October 22, 1992, the Court is now prepared to rule on this matter. This Opinion and Order sets forth that ruling.

**II. THE PARTIES**

Plaintiff Penny Klei is the widow of the late Eugene Klei, a former hourly employee of General Motors Corporation ("GM"). Mr. Klei was a participant in GM's Life and Disability Benefits Program (the "GM Plan" or the "Plan"). Mrs. Klei is Mr. Klei's designated beneficiary under the GM Plan. Defendant Metropolitan Life Insurance Company ("MetLife") is responsible for reviewing and processing claims, and administering benefits under the Plan.

**III. FACTUAL BACKGROUND**

General Motors' life and disability [*2] insurance plan provides for the payment of "basic" life insurance benefits upon the death of a covered employee participant to the employee's beneficiary of record. The Plan also provides for the payment of "extra" accident benefits if a covered employee "sustains accidental bodily injuries, and within one year thereafter . . . suffers loss of life . . . as a direct result of such bodily injuries independently of all other causes. . . ." [See Part VII, Section A, the "Insuring Clause", page 8 of the MetLife/GM Group Insurance Certificate, attached to Plaintiff's Complaint.] However, the Plan expressly excludes from its "extra" accident benefits coverage "any loss which is caused wholly or partly, directly or indirectly, by disease or bodily or mental infirmity, or . . . intentional self-destruction or intentionally self-inflicted injury, while sane or insane." Id. n1

n1 The "Insuring Clause", in full, states as follows:

If, while insured for Extra Accident Insurance under the Group Policy, the Employe sustains accidental bodily injuries, and within one year thereafter shall have suffered loss of life or within 2 years thereafter shall have suffered any other loss, as specified in the Schedule of Losses in this Section A, as a direct result of such bodily injuries independently of all other causes, the Insurance Company shall pay the amount of insurance specified under such loss in said Schedule, provided, however that in no case shall such payment be made for any loss which is caused by:

(1) disease or bodily or mental infirmity, or by medical or surgical treat-

  

ment, or diagnosis thereof, or

(2) any infection, except infection caused by an external visible wound accidentally sustained, or

(3) hernia, no matter how or when sustained, or

(4) war, or any act of war, or

(5) intentional self-destruction or intentionally self-inflicted injury, while sane or insane.

[*3]

A. MR. KLEI'S AUTOMOBILE ACCIDENT AND MEDICAL CONDITION

Eugene Klei was injured in an automobile accident in the afternoon of August 18, 1990. n2 The police report of the accident [Defendant's Ex. G] states that Mr. Klei, who was driving his own van, had approached the ramp from eastbound West 8 Mile Road to southbound Telegraph Road at a "high rate of speed" and was "unable to make [the] right curve." Id. Mr. Klei's van struck the guard rail and he was "thrown from [his] vehicle as [it] rolled over." Id. Mr. Klei was taken by ambulance from the accident scene to Botsford General Hospital.

> n2 Mr. Klei was on a disability leave of absence from GM at the time of the accident. He had been on disability leave for approximately two months, since June 19, 1990.

The police on the scene of the accident found an "open bottle of Seagram's liquor" in Mr. Klei's van, and blood and urine tests performed on Mr. Klei at Botsford Hospital were positive for alcohol and drugs. [See Botsford Hospital report, Ex. F-1.] [*4] Mr. Klei's diagnosis listed, among his injuries, a "traumatic subdural hematoma" and "ethanol and opiate abuse". Id. n3

> n3 According to the hospital records [Defendant's Ex. F-1 - F-5], Mr. Klei had a history of alcohol and drug (heroin) abuse and had been previously hospitalized and treated for substance abuse and addiction. He told medical staff upon his admission to the hospital following his automobile accident that he had a "$ 50/week" heroin habit and that he drank "a pint of whiskey a day". As part of his treatment during his stay in Botsford Hospital following his automobile accident, Mr. Klei was placed on medications intended to curb the effects of detoxification withdrawal.

Mr. Klei signed himself out of the hospital "against medical advice" two days after the accident, August 21, 1990. Id. He was instructed to continue on the medications prescribed during his hospital stay, but left the hospital before hospital staff could get the medications to him. Id.

A week later, on August 29, 1990, Mr. [*5] Klei was readmitted to the hospital after he was "found on the floor at home disoriented." [See Defendant's Ex. F-4.] He was "intoxicated at the time" of his readmission. Id. Mr. Klei's family told the emergency room attending physician that Mr. Klei "will not quit drinking." [Defendant's Ex. F-2.] He was hospitalized once again, this time for a week.

Throughout this second hospital stay, Mr. Klei "continued to complain of wanting to go home without medical treatment." [Ex. F-4.] He was placed on the anti-convulsive drug, Dilantin, during this stay, and that medication was prescribed for his continued care upon his discharge. Id. Mr. Klei was discharged on September 6, 1990, with special instructions to "abstain from alcohol." Id. See also, Discharge Instructions, Ex. F-3, "Diet/Food Instructions: NO ALCOHOL".

On September 15, 1990, Mr. Klei died at his home. On the day of his death, Mr. Klei "consumed the better part of a fifth of liquor." [See Plaintiff's Answer to Defendant's Interrogatory No. 20 at Defendant's Ex. L.] The death certificate indicates that the cause of Mr. Klei's death was "acute ethanol intoxication". [Defendant's Ex. C.] The autopsy report also [*6] identified the cause of death as "acute ethanol intoxication". [See Ex. E.] The autopsy report further indicated that Mr. Klei's post-mortem blood/alcohol level was .44%. Id.

B. MRS. KLEI'S CLAIM FOR INSURANCE BENEFITS

Following Mr. Klei's death, Mrs. Klei submitted a claim to MetLife for both basic life and extra accident insurance benefits under the GM Plan. [See Defendant's Ex. D.] MetLife, after reviewing the claim and Mr. Klei's death certificate, paid Mrs. Klei basic life insurance benefits of $32,500 plus interest on December 27, 1990.

With respect to Plaintiff's claim for $16,500 "extra" accident benefits, however, MetLife requested additional documentation. MetLife requested, and subse-

  

quently received, copies of Mr. Klei's hospital records and his autopsy report. Mr. Klei's file was submitted for review to Dr. Richard Solomon of MetLife's Medical Department. Dr. Solomon reviewed the file and concluded that Mr. Klei's "death was the result of acute alcohol intoxication."

After reviewing Mr. Klei's file, which included his hospital records, autopsy report, death certificate and Dr. Solomon's conclusion, MetLife determined that Mr. Klei's death was not the result [*7] of an accident covered by the GM Plan. MetLife informed Mrs. Klei of its decision in a letter dated March 21, 1991. In that letter, MetLife explained to Mrs. Klei:

> Dear Mrs. Klei:
>
> The claim for Extra-Accident benefits under the General Motors Group Policy has been thoroughly reviewed.
>
> The information we have indicates that Mr. Klei died as a result of "acute ethanol intoxication." The autopsy report also substantiates this as the cause of death.
>
> The Group Policy provides for payment of these additional benefits only when death is an accidental result "directly and independently of all other causes." It further states that benefits will not be paid if the insured's death is "caused wholly or partly, directly or indirectly, by disease or bodily or mental infirmity . . . or intentional self-destruction or intentionally self-inflicting injury, while sane or insane." Moreover, under the federal common law applicable to the General Motors ERISA plan, a death caused by substance abuse, such as excessive use of ethanol, should not qualify for accidental death benefits.
>
> Since Mr. Klei had a prior history of chronic ethanolism, and had been warned to avoid alcohol abuse, we [*8] regret that Extra-Accident benefits are not payable.
>
> You may request a review of the claim by writing directly to the Group Insurance Claims Review, Metropolitan Life Insurance Company, at the address indicated in this letter. . . .
>
> Very truly yours
>
> /s/
>
> Carolyn Schmidt, Senior Claims Approver, General Motors Claims-Death, Group National Accounts
>
> March 21, 1991

[Defendant's Ex. I.]

Plaintiff, through her attorney, requested two reviews of MetLife's denial of her extra accident benefits claim. n4 In each instance, MetLife adhered to its original decision that Mr. Klei's death was not caused by an accident within the meaning of the GM Plan, and that benefits were not payable. [Defendant's Ex. K.]

> n4 Plaintiff's intra-plan appeal arguments were essentially the same arguments she makes in this action — that although she concedes that the death certificate and autopsy report indicate that the cause of Mr. Klei's death was "acute ethanol intoxication", the "manner" of death was listed as an "accident". Plaintiff, thus, argued in her administrative claim reviews — as she does in this case — that her husband's death should be construed as "accidental" under the provisions of the GM Plan not only because the medical examiner stated that the "manner" of death was an accident, but also because in Plaintiff's opinion, the term "acute" intoxication refers to a sudden onset and a short, severe course (as opposed to a prolonged alcohol intake involved in the "disease or sickness of alcoholism"). Without any expert medical evidence to support her arguments, Plaintiff contends that since the autopsy report did not indicate brain, liver or digestive system damage, there is insufficient evidence that the "disease or sickness of alcoholism" caused her husband's death and, therefore, his "acute alcohol intoxication" death should be deemed to have been "sudden and accidental" and within the Plan's extra-accident benefits coverage. [See Defendant's Ex. J.] (She further argued in her administrative appeals, just as she does in this case, that Michigan law, not "federal common law" should be referred to in determining whether Mr. Klei's acute ethanol intoxication death should be deemed "accidental" under the GM Plan provisions. Id.)

[*9]

C. PROCEDURAL HISTORY OF THE INSTANT JUDICIAL ACTION

  

Following MetLife's denial of her last intra-Plan appeal, Mrs. Klei initiated the instant action in Michigan state court alleging that Mr. Klei "died from accidental ethanol intoxication on September 15, 1990 subsequent to an auto accident on August 18, 1990". [Complaint para. 7. See also, Plaintiff's Brief, p. 4.] Her claim is that MetLife "erroneously interpreted plan provisions providing for accidental death benefits under the 'federal common law', and "failed to consider evidence submitted by plaintiff establishing accidental death"; and that MetLife's claims examiners decision denying her claim for extra accident benefits was "arbitrary, capricious, not made in good faith, unsupportable [sic] by substantial evidence, erroneous as a matter of law, and in violation of ERISA." [Plaintiff's Complaint, para. 12-15.] MetLife timely removed the action to this Court.

On August 3, 1992, Defendant's filed a Motion for Summary Judgment. Plaintiff responded to Defendant's Motion and "counter-moved" for entry of summary judgment in her own favor on August 11, 1992. On September 16, 1992, MetLife filed a Reply Brief in further support [*10] of its own motion for summary judgment and in opposition to Plaintiff's counter-motion.

## IV. GENERAL LEGAL PRINCIPLES

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases — Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); and Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) — ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion. n5 According to [*11] the Celotex Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex, 106 S. Ct. at 2552.

> n5 Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, Federal Practice & Procedure, § 2727.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

> * Cases involving state of mind issues are not necessarily inappropriate for summary judgment.
>
> * The movant must meet the initial burden of showing [*12] "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."
>
> * The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
>
> * The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "where the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

  

Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989). [*13] The Court will apply the above principles in deciding the parties' motions for summary judgment in this case.

B. STANDARD AND SCOPE OF JUDICIAL REVIEW IN ERISA CASES

The Supreme Court has ruled that the standard of review in ERISA cases is de novo unless the benefit plan gives the plan administrator discretion to determine eligibility for benefits or to construe plan terms:

> As this case aptly demonstrates, the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue. Consistent with established principles of trust law, we hold that a denial of benefits challenged under Section 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956, 103 L. Ed. 2d 80 (1989) (emphasis added). Thus, it is clear that it is only if the benefit plan gives the administrator "discretionary authority to determine eligibility [*14] for benefits or to construe the terms of the plan", that the trial court may use an "arbitrary and capricious" standard in reviewing the administrator's claim determination.

The Sixth Circuit has broadly interpreted the Firestone court's holding. In Miller v. Metropolitan Life Ins. Co., 925 F.2d 979 (6th Cir. 1991), the court held that the ERISA plan does not have to give the insurer complete discretion with respect to the ultimate determination of benefit eligibility. Id. at 984, citing, Bali v. Blue Cross and Blue Shield Ass'n, 873 F.2d 1043, 1047 (7th Cir. 1989). However, under the Miller court's formulation of the rule, to satisfy the Firestone "grant-of-discretionary-authority" touchstone and trigger an "arbitrary and capricious" standard the benefit plan must grant the plan administrator the discretion

> (1) to make reasonable requests for documentation and (2) to determine what evidence may be required to provide a basis for [benefit eligibility] determination."

925 F.2d at 984 (enumeration and emphasis added).

Defendant [*15] argues that because Part VII, Section B(2) of the GM Plan at issue here grants MetLife the discretion to make reasonable requests for evidence providing the basis for an extra accident benefit claim the Plan meets the Miller/Firestone standard. The section of the Plan relied upon by MetLife provides as follows:

> The Insurance Company, at its own expense, shall have the right and opportunity to have such medical examinations of the person of the Employe, as often as it may reasonably require, made by a physician or physicians designated by it while Extra Accident Insurance benefits are being claimed under the Group Policy, and also the right to have an autopsy made in case of death, where it is not forbidden by law.

[See the GM Hourly Employees Group Insurance Policy Certificate, attached as an exhibit to Plaintiff's Complaint.]

This Court, however, does not find that the foregoing provision meets the Firestone/Miller "discretionary authority" standard, thereby calling for application of an "arbitrary and capricious" standard of review. n6 While the Court accepts that the cited Plan provision grants MetLife the discretionary authority "to make reasonable [*16] requests for documentation" of claims, the Court does not read into this section any grant of discretionary authority "to determine what evidence may be required to provide a basis for benefit eligibility determination". n7

> n6 This Court has previously held in two other ERISA denial-of-benefits cases — Criss v. The Hartford Accident and Indemnity Co., 1991 U.S. Dist. LEXIS 16452 (E.D. Mich. 1991), aff'd, 1992 U.S. App. LEXIS 13288 (6th Cir. 1992) and Lecznar v. Aetna Life Ins. Co., 1990 U.S. Dist. LEXIS 19657 E.D. Mich. 1990) — that de novo review was called for. While those cases involved different employee-benefit plans administered by different insurers (i.e., they did not involve a GM plan administered by MetLife), as with this case, in Criss and Lecznar, the Court found no provision in the subject ERISA plans granting the plan administrators sufficient express or implied discretionary authority so as to trigger an "arbitrary and capricious" standard of review, and therefore, the Court held that a de novo standard of review was mandated.

  

[*17]

n7 The Court acknowledges that in interpreting the GM/MetLife Plan as not providing sufficient discretionary authority so as to call for application of an "arbitrary and capricious" review standard, it is diverging from the holding of three of its federal district court brethren in Michigan who have held that denial of benefits claims under GM policies would be reviewed under an "arbitrary and capricious" standard. See Pressley v. Metropolitan Life Ins. Co., 729 F. Supp. 570 (E.D. Mich. 1990); McKinley v. Metropolitan Life Ins. Co., 1991 U.S. Dist. LEXIS 8579 (W.D. Mich. 1991); Donato v. Metropolitan Life Ins. Co., No. 91-CV-72607-DT, 6/21/91 Opinion and Order (E.D. Mich. 1992). See also, Wood v. Metropolitan Life Ins. Co., CA IP 1265-C, 10/26/89 Opinion and Order (S.D. Ind. 1989). However, all of these cases were disability benefit cases, not "extra accident" insurance cases, and therefore, were governed by different provisions of the GM Plan other than the provisions governing Plaintiff's claims in this suit.

[*18]

Based upon the foregoing, this Court finds that the GM ERISA plan at issue in this case, and Defendant MetLife's determinations thereunder, are subject to a de novo standard of review.

However, the Court's review of Defendant's denial of Plaintiff's benefits claim is limited to the evidence previously presented to and considered by the plan administrator. Miller v. Metropolitan Life Ins. Co., supra, 925 F.2d 979, 986; Perry v. Simplicity Engineering, 900 F.2d 963 (6th Cir. 1990); Crews v. Central States, 788 F.2d 332, 336 (6th Cir. 1986) (quoting Wardle v. Central States, 627 F.2d 820, 824 (7th Cir. 1980), cert. denied, 449 U.S. 1112 (1981)). See also, Criss v. The Hartford Accident and Indemnity Co., supra. n8

n8 The Court notes that this limitation applies to both an "arbitrary and capricious" standard or a de novo standard of review. See Miller v. Metropolitan Life Ins. Co., supra, 925 F.2d at 986 and cases cited therein.

[*19]

In McMahan, decided after the Supreme Court's decision in Firestone, the Sixth Circuit reaffirmed its belief that ERISA review should be limited to facts presented to the plan administrator, but noted that the change in the standard of review might signal the need to revisit this question:

While the Firestone Court's rejection of the "arbitrary and capricious" standard of review might argue for a reconsideration of Crews, we are bound by Crews as the law of this Circuit. Accordingly, in supplementing the record and reviewing de novo New England's denial of benefits, the district court should consider only the evidence that was available to New England at the time of its final decision in this case.

McMahan, 888 F.2d at 431, n. 1.

In Perry, the court revisited and reaffirmed Crews:

Careful reconsideration of Crews, however, yields a determination that the de novo review required by [Firestone v.] Bruch is a de novo review of the record before the administrator or fiduciary, and that the reasoning of Crews is still sound.

Id. at 966. Thus, the standard of review in this [*20] case is de novo and the scope of review will be limited to the evidence before the plan administrator at the time of his decision.

C. FEDERAL COMMON LAW CONTROLS IN THIS CASE

In § 514(a) of ERISA, 29 U.S.C. § 1144(a), Congress provided:

Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

Congress employed broad language so as to ensure that the law governing ERISA plans would remain a federal concern. Congress intended that "a federal common law of rights and obligations under ERISA-regulated plans would develop." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56 (1987).

As stated by the Sixth Circuit, "ERISA's broad pre-

  

Case 1:02-cv-00147-SSB-TSH   Document 24-2   Filed 09/11/2003   Page 7 of 11

Page 7
1992 U.S. Dist. LEXIS 21285, *20

emption provision makes it clear that Congress intended to establish employee benefit plan regulation as an exclusive federal concern, with federal law to apply exclusively, even where ERISA itself furnishes [*21] no answer." Lingerfelt v. Nuclear Fuel Services, Inc., et al., 1991 U.S. App. LEXIS 1822 (6th Cir. Feb. 5, 1991) at *6 (quoting In re White Farm Equipment Co., 788 F.2d 1186, 1191 (6th Cir. 1986)). See also, Holsinger v. New England Mut. Life Ins. Co., 765 F. Supp. 1279, 1281, n.1 (E.D. Mich. 1991) ("The benefit provisions of an ERISA regulated group life insurance program must be interpreted under principles of federal substantive law." Id., citing, Wickman v. Northwestern Nat. Ins. Co., 908 F.2d 1077 (1st Cir. 1990)). n9

> n9 As federal law controls this case, contrary to Plaintiff's contentions, state law approaches cannot be held to be determinative of the issues before the Court. However, Plaintiff is correct in her assertion that the Court may refer to relevant state law in an attempt to develop the burgeoning area of ERISA federal common law. As noted by the First Circuit:
>
>> Nonetheless, in developing the federal common law, it is not inappropriate that we examine the various state law approaches, states generally having had much more experience in the area of insurance contract interpretation. Borrowing those concepts which are best reasoned may be prudential.
>
> Wickman v. Northwestern Nat. Ins. Co., supra, 908 F.2d 1077 at 1084. The Court notes that Wickman involved an issue of first impression on which there was no prior federal common law. It was for that reason that the court looked to state law for guidance.
>
> The Fourth Circuit Court of Appeals apparently felt free to disregard a prior federal court of appeals decision that was directly on point but that was decided under diversity jurisdiction using Virginia law. Instead, that court opted for the analysis applied in a Kentucky state court decision. Adkins v. Reliance Standard Life Ins. Co., 917 F.2d 794 (4th Cir. 1990).
>
> This Court interprets the approaches advanced by the Wickman and the Adkins courts to mean that, when confronted with an ERISA issue as to which no federal common law precedent has been developed, a federal court may consider approaches taken by the various state courts. Where, however, federal precedent already exists, it is federal law that is to be applied.

[*22]

### V. DISCUSSION

There is no dispute in this case that the cause of Mr. Klei's death was "acute alcohol intoxication." The crux of this case is whether Mr. Klei's "acute alcohol intoxication" on September 15, 1990 constituted an "accidental bodily injury" under the provisions of the GM group insurance policy, or whether his death was caused "wholly or partly, directly or indirectly" by (a) "disease or bodily or mental infirmity" or (b) "intentional self-destruction or self-inflicted injury", and therefore, excluded from extra accident insurance coverage.

The Court begins its analysis by noting that a review of an ERISA-regulated insurance policy must give due respect to the plain language of the policy. As explained by the First Circuit Court of Appeals:

> Notwithstanding the ennobling purposes which prompted passage of ERISA, courts have no right to torture language in an attempt to force particular results or to convey delitescent nuances the contracting parties neither intended nor imagined. To the exact contrary, straightforward language in an ERISA-regulated insurance policy should be given its natural meaning.

Burnham v. Guardian Life Ins. Co. of America, 873 F.2d 486, 489 (1st Cir. 1989). [*23] This approach was specifically adopted by the Sixth Circuit in Lingerfelt v. Nuclear Fuel Services, Inc., supra: "However, Lingerfelt can point to nothing in the federal common law in this area which would indicate that we should depart from the general meaning of the language of his accident insurance policy." Lingerfelt, 1991 U.S. App. LEXIS 1822 at *6.

The Court finds the plain language of the GM group insurance policy to be dispositive. The relevant language of the policy reads as follows:

> If, while insured for Extra Accident Insurance under the Group Policy, the Employe sustains accidental bodily injuries, and within one year thereafter shall have suffered loss of life or within 2 years thereafter shall have suffered any other loss, as specified in the Schedule of Losses in this Section A, as a direct result of such bodily

  

Case 1:02-cv-00147-SSB-TSH   Document 24-2   Filed 09/11/2003   Page 8 of 11

Page 8
1992 U.S. Dist. LEXIS 21285, *23

injuries independently of all other causes, the Insurance Company shall pay the amount of insurance specified under such loss in said Schedule, provided, however that in no case shall such payment be made for any loss which is caused by:

(1) disease or bodily or mental [*24] infirmity, or by medical or surgical treatment, or diagnosis thereof, or

(2) any infection, except infection caused by an external visible wound accidentally sustained, or

(3) hernia, no matter how or when sustained, or

(4) war, or any act of war, or

(5) intentional self-destruction or intentionally self-inflicted injury, while sane or insane.

(Emphasis added.) The Court finds nothing in the policy behind ERISA that would permit a court to distort the plain meaning of a contract to grant expanded coverage.

In Lingerfelt v. Nuclear Fuel Services, Inc., supra, the Sixth Circuit emphasized the importance of a strict interpretation of the plain language of an insurance policy.

In that case, the plaintiff, who had for years suffered from degenerative back disease, injured his back while lifting a heavy object. He filed a claim under his employer's accident disability insurance plan claiming that he was totally disabled. The insurance company denied his claim on the ground that the injury was caused by his preexisting back disease and the policy covered only disability arising "directly and independently" from injuries [*25] caused by accident. The magistrate judge affirmed the decision of the plan administrator and the court of appeals affirmed the magistrate judge's decision.

The court found determinative the clear language of the insurance contract specifying the limits of the coverage. The policy contained exclusionary language similar to the language at issue in this case. That language, said the court, should be honored absent some countervailing public policy considerations:

> However, Lingerfelt can point to nothing in the federal common law in this area which would indicate that we should depart from the literal meaning of the language of his accident insurance contract.
>
> * * *
>
> We believe that under the emerging federal common law, we should adhere to the literal language of accident insurance contracts except where public-policy considerations dictate a different course.

Lingerfelt, 1991 U.S. App. LEXIS 1822 at *6. To do otherwise, said the court, would be to "distort the parties' initial bargain by changing the allocation of risk which the parties had in mind when they agreed to the amount of the insurance premium." Id. at 5.

The court observed [*26] that the public-policy behind ERISA is to ensure that the number of persons enrolled in ERISA plans increases and that the terms of the plan not be unduly restrictive. It referred to language of the Eleventh Circuit Court of Appeals: "Congress wanted to assure that those who participate in the plans actually receive the benefits they are entitled to and do not lose these as a result of unduly restrictive provisions or lack of sufficient funds." Helms v. Monsanto, 728 F.2d 1416, 1420 (11th Cir. 1984) (citing H.R.Rep. No. 93-807, 93rd Cong., 2nd Sess. 3, reprinted in 1974 U.S. Code Cong. & Ad. News 4639, 4670, 4676-77).

The court then examined the contract and found that it was not unduly restrictive. Decisive in its determination was the fact that the terms of the policy, as applied to the circumstances before it, did not upset the claimant's reasonable expectations as to the scope of the policy. It noted that the plaintiff had been warned of the dangers of straining his back but persisted nonetheless in heavy lifting. It also observed that the lifting injury was not caused by an accident in the common sense of the word, but was part of claimant's everyday [*27] occupational duties.

Similarly, in this case, Plaintiff's decedent had been explicitly instructed by his doctors to completely abstain from alcohol consumption but he persisted nonetheless in continuing to drink. Further, as the court observed with respect to Mr. Lingerfelt, — and contrary to Plaintiff's contention — Mr. Klei's "injury" was not caused by an "accident" in the common sense of the word. n10

> n10 Plaintiff's argument that Mr. Klei's death was "accidental" is predicated solely upon the fact that the medical examiner indicated in the autopsy report and on the death certificate that the "man-

  

ner" of Mr. Klei's death was an "accident" (The Court notes that on the death certificate, the medical examiner actually appears to have indicated "accident" with some degree of uncertainty because the actual notation is "accident — pending", apparently meaning "pending investigation".) In any event, the Court finds that the medical examiner's classification of the manner of death to be of little or no import, whatsoever, with respect to this action for several reasons. First, it appears from these records that the medical examiner is only given four choices of "manner" of death to select from — accident, suicide, homicide, or natural. Second, as Defendant points out, the medical examiner's determination was made without reference to Mr. Klei's medical history.

[*28]

Even if the Court were to accept Plaintiff's tortured argument that Plaintiff's death was "accidental", the insurance policy expressly provides that "in no case shall payment be made for any loss which is caused wholly or partly, directly or indirectly by . . . intentionally self-inflicted injury." This language is virtually identical to the exclusionary language relied upon by the court in Holsinger v. New England Mut. Life Ins. Co., 765 F. Supp. 1279 (E.D. Mich. 1991), a case in which the plaintiff's decedent, who had a history of drug abuse, died from a drug overdose.

As in this case, in Holsinger, the plaintiff had made a claim for accidental death benefits under the decedent's ERISA plan. The defendant insurance company denied her claim, and when legal proceedings were filed, the insurer moved for summary judgment claiming that plaintiff's loss (1) was not a result of bodily injury effected solely through accidental means, and (2) resulted directly or indirectly, wholly or partially from intentionally self-inflicted injury and/or bodily or mental infirmity.

The ERISA-regulated insurance policy at issue in Holsinger covered accidental [*29] death benefits if the insured's death was caused by "bodily injury effected solely through external, violent or accidental means, directly and independently of all other causes." 765 F. Supp. at 1280. The policy further contained exclusionary language substantially similar to the exclusionary language in the GM policy at issue in this case. In pertinent part, the Holsinger policy provided:

> No amount shall be paid under the foregoing provisions for any loss resulting directly or indirectly, wholly or partially from:
>
> (1) suicide or intentionally self-inflicted injury, whether sane or insane.

Id. at 1281-1282 (some emphasis supplied).

Although the court rejected the defendant's "plaintiff's-death-was-effected-through-accidental-means" argument because it found the phrase "accidental means" as used in the policy to be ambiguous, n11 it found the policy's "self-inflicted injury" language to be unambiguous. To determine whether this "plain language" applied in Holsinger's case (which as indicated above, involved death caused by a drug overdose), the court fashioned a four-part test. The court explained [*30] its test as follows:

> To determine whether [the policy's] "plain language" applies, the court must answer four questions. First, was the ingestion of drugs intentional? Second, did the decedent know that the ingestion of drugs would be likely to cause an injury? Third, did the ingestion of drugs cause an injury? Fourth, did the loss result from the injury? If there is no genuine factual dispute as to any of these questions, summary judgment is appropriate.

765 F. Supp. at 1282.

> n11 Citing Wickman v. Northwestern Nat. Ins. Co., 908 F.2d 1077 (1st Cir. 1990), the Holsinger court determined that the issue of whether an injury was caused by "accidental" means involved a question of fact — i.e., whether the insured should reasonably have expected the injury in question to result from his actions — and, thus, it was a matter to be decided by the jury. 765 F. Supp. at 1281.

The court then went on to apply its test. With [*31] respect to the first prong — whether the ingestion of drugs was intentional — the court observed that there was "no dispute that the decedent intentionally ingested the drugs." Id.

As for the second prong — whether the decedent knew that the ingestion of drugs would be likely to cause an injury — the court elaborated:

> If prescription drugs are ingested for a purpose other than the therapeutic effect for which they are designed, as was the case in the instant matter, the sole questions are

  

whether such ingestion could produce an injury and whether the person ingesting the drugs knew they could produce an injury. For example, if a child ingests a bottle of barbiturates because he thinks they are candy, it is clear the child does not know that the ingested drug can produce injury.

It is important to note that the injury caused by an ingestion of prescription drugs taken for a purpose other than the therapeutic effect for which they are designed need not be the injury that results in the loss. For example, when the loss is death, it is not necessary that the person ingesting the drugs know that death could result. If the person ingesting the drugs has a general cognizance [*32] that the drugs could produce some injury, it is enough that there is some causal relation between the injury caused and the ultimate loss. For example, in Metropolitan Life Ins. Co. v. Main, 383 F.2d 952, 958 (5th Cir. 1967), the court noted that the "effect of alcohol and drugs causes an injury of a chemical nature on . . . the . . . brain. . . ." (emphasis added).

It is clear that ingestion of drugs by the decedent could cause an injury. The quantity of codeine ingested by the decedent produced an injury of a chemical nature, depressing the bodily functions. It is equally clear that the decedent, a pharmacist and long time drug abuser, knew the drugs could cause such an injury. It is irrelevant that decedent may have believed that due to his tolerance to drugs, he would not die from the ingestion of the drugs.

765 F. Supp. at 1282.

With respect to the third and fourth prongs of the test -- whether the ingestion of drugs caused an injury and whether the loss resulted from the injury -- the Holsinger court stated, "It is beyond peradventure that the drugs did cause [an] injury that decedent expected [*33] . . . and that this injury ultimately contributed to his death." Id. Accordingly, the court held that there was no genuine issue as to any material fact as to whether the decedent's death was the result of an "intentionally self-inflicted injury", and summary judgment was entered in favor of the defendant insurance company. Id. n12

n12 See also, Wickman v. Northwestern Nat. Ins. Co., 908 F.2d 1077 (1st Cir. 1990), a case involving interpretation of a provision in an ERISA plan which specifically excluded losses caused by self-inflicted injuries, in which the appellate court affirmed the district court's framing of the inquiry as calling for a determination of whether the decedent "knew or should have known that serious bodily injury or death was a probable consequence substantially likely to occur as a result of his volitional act. . . ." Id. at 1089.

This case is remarkably similar to Holsinger, and, therefore, application of the [*34] Holsinger test is appropriate. In this case, Plaintiff admits that Mr. Klei intentionally consumed almost a fifth of liquor on September 15, 1990. Mr. Klei had at least a "general cognizance" that ingestion would be likely to cause an injury, as he had been previously been hospitalized for alcohol abuse and was specifically instructed by his doctors to completely abstain from drinking when he was discharged from the hospital on September 6, 1990. Based on his own past experiences and the doctors, explicit instructions, Mr. Klei should have expected that an injury would be highly likely to occur as a result of consuming nearly a fifth of liquor on September 15, 1990. There is clearly a causal relation between Mr. Klei's "injury" and the ultimate loss of his life. The county medical examiner and Dr. Solomon of MetLife's Medical Department both concluded that the cause of Mr. Klei's death was caused by acute alcohol intoxication.

For the foregoing reasons, the Court finds that MetLife's decision to deny Plaintiff's claim for extra accident benefits was proper.

There is yet another reason for upholding MetLife's decision to deny Plaintiff's claim. The record before the Court shows [*35] that disease (i.e., alcoholism) contributed to his death. Mr. Klei admittedly was addicted to alcohol. He had a history of alcohol abuse and had previously been hospitalized for alcoholism and drug abuse. When Mr. Klei was brought into the emergency room intoxicated on August 29, 1990, his family told the doctors that "he will not quit drinking." In addition, Mr. Klei related to the hospital staff that he consumed a pint of whiskey per day.

The rule in this Circuit is that where a policy insuring against accidental death contains exclusionary language substantially to the effect that benefits are precluded where death, directly or indirectly results from or is contributed to by disease, it is proper to inquire whether death was caused entirely independently of the disease. Ann Arbor Trust Co. v. Canada Life Assur. Co., 810 F.2d 591 (6th Cir. 1987).

  

In the Ann Arbor Trust case, the decedent fell down a flight of stairs and cut his head. At first, the wound healed normally, but later the decedent began to manifest signs of internal hemorrhaging. His symptoms were diagnosed as a blood disorder. Decedent died soon thereafter. An autopsy disclosed [\*36] the cause of death as advanced cirrhosis of the liver caused by decedent's alcohol consumption. Two physicians testified at trial and confirmed that, but for the cirrhosis of the liver, decedent's fall and resulting injury would not have caused his blood disorder and resulting death. Decedent's accidental death policy contained exclusionary language. At trial, a jury found for the plaintiff. The court of appeals reversed and held that the defendants' motion for a directed verdict at the close of all the evidence should have been granted.

Dispositive for the court was the explicit language of the policy excluding death caused even in part by disease. When an insurance policy contains such clear exclusionary language, said the court, the inquiry is "limited to determining if the accident alone was sufficient to cause death directly and independently of disease." 810 F.2d at 593. This type of insurance policy, the court added, is to be distinguished from policies which do not contain specific exclusionary language, in which case the plaintiff can recover if the accident was the direct and proximate cause of death:

> The existence of pre-existing disease [\*37] will therefore not bar recovery under such a policy if bodily injury and/or death results from a combination of accident and pre-existing disease, so long as the accident activated the condition which ultimately caused the injury and/or death.

Id. See also Shiffler v. Equitable Life Assur. Soc. of U.S., 838 F.2d 78, 84 (3rd Cir. 1988) (if policy contains exclusionary language, no recovery if pre-existing clause contributed to the death); Criss v. The Hartford Accident and Indemnity Co., supra, 1992 U.S. App. LEXIS 13288 (6th Cir. 1992) (where insurance policy specified on its face that the cause of death must be an accident independent of any other cause, and where the record before the ERISA-plan administrator and the district court established that decedent's heart disease contributed at least partly to his death, summary judgment was properly entered in favor of the defendant insurance company).

In Questech, Inc. v. Hartford Acc. and Indem. Co., 713 F.Supp. 956 (E.D.Va. 1989), the decedent was insured under an accident policy that contained exclusionary language. [\*38] He died when his car left the road and crashed into a guardrail. He was wearing his seat belt and showed no signs of trauma. No autopsy was performed and the medical examiner listed the cause of death as cardiac arrest due to coronary arteriosclerosis. Despite the conflicting nature of the testimony concerning the cause of death — the emergency room physician claimed heart attack while decedent's personal physician said that decedent had no history or symptomatology of coronary arteriosclerosis — the court granted the defendant's motion for summary judgment, concluding that the plaintiff failed to prove that decedent died solely by accidental means.

The same is true in this case — Plaintiff has failed to prove that Mr. Klei's death was caused by an accident entirely independent of a "disease, or bodily or mental infirmity".

In sum, following the plain language of the GM policy, this Court finds that Plaintiff's claim is precluded by explicit exclusionary language, excluding from extra accident insurance coverage claims for death "caused wholly or partly, directly or indirectly by disease or bodily or mental infirmity . . . or . . . intentionally self-inflicted injury."

VI. [\*39] CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be and hereby is, GRANTED, and Plaintiff's Counter-Motion for Summary Judgment is hereby DENIED. Accordingly,

IT IS FURTHER ORDERED that this case be DISMISSED in its entirety with prejudice.

Let Judgment be entered accordingly.

Gerald E. Rosen

United States District Judge

DATED: OCT 30 1992

